## EMERY v. UNITED STATES.

(District Court, D. Connecticut.  June 8, 1926.)

No. 2988.

**1. United States ⬅130—May set off against contractor money owing to it under another contract.**

Where a contractor is a creditor under one contract, the government may set off, without separate action, an amount owing to it by that contractor under another contract.

**2. Officers ⬅111—Parties receiving money illegally paid by public officer or agent liable to refund it, but decisions of executive officers as to illegality not conclusive.**

Parties receiving moneys illegally paid by a public officer are liable ex æquo et bono to refund them, but it is for the court to determine whether the payments were illegal, and the decisions of executive officers are not binding on it.

**3. United States ⬅65—That contract is not in writing, as required by statute, is immaterial after performance (Rev. St. § 3744 [Comp. St. § 6895]).**

Under Rev. St. § 3744 (Comp. St. § 6895), requiring all contracts made by the War or Navy Departments to be in writing and signed, there can be no recovery against the government on an executory contract which does not comply with such requirement, but noncompliance is immaterial after the contract has been performed.

**4. United States ⬅65—Government is liable for services rendered or articles furnished and accepted under oral contract.**

Where services are rendered or articles furnished to the government under an oral contract, and such services or articles are accepted and inure to the benefit of the government, recovery may be had on a quantum meruit.

**5. Reformation of instruments ⬅19(1).**

Instrument which, through mutual mistake, does not express the real intention of the parties, may be reformed in equity.

**6. United States ⬅75—Increased payment made under amended contract held not recoverable as illegal.**

Plaintiff contracted with the proper officer to manufacture for the Navy Department an experimental gun, made by a new process, to be paid for necessary labor, material, and expenses, all expenditures to be under direction of the Chief of the Bureau of Ordnance, "total cost not to exceed $5,000." The limit of $5,000 was not intended to be final, but was merely an estimate of the cost, and by letter to plaintiff from the officer who signed the contract it was amended to include a further payment, because of the cost exceeding the estimate, and such payment was made when the gun was delivered and accepted. *Held*, that the government could not recover such additional payment on the ground that it was unauthorized and illegal.

At Law.  Action by Albert H. Emery against the United States.  Judgment for plaintiff.

Cummings & Lockwood and William A. Kelly, all of Stamford, Conn., for plaintiff.

John Buckley, U. S. Atty., and George H. Cohen, Asst. U. S. Atty., both of Hartford, Conn.

THOMAS, District Judge.  This case was submitted on an agreed statement of facts, together with certain exhibits, consisting of a file certified by the Comptroller General of the United States.  The agreed statement of facts shows that the plaintiff, a citizen of the United States and a resident of Connecticut, on an order of the Department of Commerce dated April 21, 1925, delivered to the Bureau of Standards, Department of Commerce, one 100,000-pound tension machine at a price of $5,000, which was found to comply with the order.  A voucher for $5,000 payable to the order of plaintiff was approved and referred to the General Accounting office for audit and settlement.  The General Accounting office withheld the sum of $969.64, which has not been paid, and it is to recover this amount that the present action is brought.  As against this claim, the government has filed a set-off of the same amount which arose out of a transaction which commenced in 1918.  It does not dispute the fact that the plaintiff earned the full amount of $5,000 under the transaction of 1924.

[1, 2] It is well settled that, where a contractor is a creditor under one contract, the government may set off, without separate action,

the amount owing to it by that contractor under another contract. Taggart's Case (1881) 17 Ct. Cl. 322; Barry v. U. S. (1913) 229 U. S. 47, 53, 33 S. Ct. 681, 57 L. Ed. 1060. It is also established that parties receiving moneys illegally paid by a public officer are liable ex æquo et bono to refund them, and it is for the court to determine whether the payments were illegal, and the decisions of executive officers are not binding on the court. Wisconsin Central Railroad Co. v. U. S., 164 U. S. 190, 212, 17 S. Ct. 45, 41 L. Ed. 399; U. S. v. Burchard, 125 U. S. 176, 8 S. Ct. 832, 31 L. Ed. 662; U. S. v. Stahl, 151 U. S. 366, 14 S. Ct. 347, 38 L. Ed. 194; Duval v. U. S., 25 Ct. Cl. 46; U. S. v Sutton Chemical Co. (C. C. A.) 11 F.(2d) 24.

In the Wisconsin Central Railroad Case, supra, which involved the question of the amount to be paid a contractor for carrying the mails on page 205 (17 S. Ct. 49) Mr. Chief Justice Fuller said:

"The Postmaster General, in directing payment of compensation for mail transportation, under the statutes providing the rate and basis thereof, does not act judicially, and whatever the conclusiveness of executive acts, so far as executive departments are concerned, as a rule of administration, it has long been settled that the action of executive officers in matters of account and payment cannot be regarded as a conclusive determination, when brought in question in a court of justice. Harmon v. United States [C. C.] 43 F. 560, by Mr. Justice Gray; Id., 147 U. S. 268 [13 S. Ct. 327, 37 L. Ed. 164]; Hunter v. United States, 5 Pet. 173 [8 L. Ed. 86]; United States v. Jones, 8 Pet. 387 [8 L. Ed. 983]; United States v. Bank of Metropolis, 15 Pet. 377 [10 L. Ed. 774]."

Therefore the question here is whether the payment of $959.64 under the transaction of 1918–1919 was an illegal payment. If so, the plaintiff's claim must be denied.

By contract dated December 12, 1918, signed by the plaintiff and by Charles Conard, Captain Pay Corps U. S. N. and Supply Officer of the United States Navy Yard at Washington, acting for the government, the plaintiff agreed to manufacture and deliver to the United States a 4-inch 50-caliber experimental gun. Article 1 of the contract provides:

"1. That he, the said party of the first part, will furnish and deliver, at his own risk and expense, at such place as stated below * * * the following articles, and at the price set opposite each item, respectively:

"For the Bureau of Ordnance, Navy Department. Washn., D. C., Rec. 405 Ord. (Bu.) Item 1. For necessary labor, material, and expenses covering the manufacture of a 4-inch 50-caliber experimental gun by the hydraulic pressure process invented by Mr. A. H. Emery. All expenditures to be made under the direction and subject to the approval of the Chief of the Bureau of Ordnance, Navy Department. Total cost not to exceed $5,000.00.

"Note.—Contractor to furnish necessary auxiliary material and work thereon, at his ordinary rate of charges, including necessary personal expenses, connected therewith."

Article 7 of the contract provided:

"That upon the presentation of the customary bills, and the proper evidence of the delivery, inspection, and acceptance of the said article, articles, or services, and within ten days after such evidence shall have been filed in the office of the Supply Officer, Navy Yard, Washington, D. C., there shall be paid to the said party of the first part, or to his order, by the Supply Officer at Washington, D. C., the sum not to exceed five thousand dollars, for all the articles delivered or services performed under this contract: Provided, however, that no payments shall be made until all the articles or services shall have been delivered or performed and accepted, except at the option of the party of the second part."

It appears that the plaintiff received the following payments on account of said contract price: February 7, 1919, $1,837.16; April 8, 1919, $2,919.91; May 14, 1919, $1,212.57—a total of $5,969.64. The claim of the government is that the payment of $969.64 above the limit set by the contract of December 12, 1918, is illegal.

Prior to the date of the last payment, by letter dated April 7, 1919, from the Bureau of Ordnance, Navy Department, at Washington, to the Bureau of Supplies and Accounts, it was requested that an additional allowance of $969.64 be made the plaintiff. Further correspondence passed between the two departments, and on May 5, 1919, the following letter was written from the Bureau of Supplies and Accounts to the Supply Officer of the Navy Yard at Washington:

"1. In view of the information furnished by Ordnance in the second indorsement, the Supply Officer is authorized to increase the estimated cost of the above mentioned requisition and contract based thereon to $5,969.64 to cover labor and material in excess of that estimated in the beginning of the experimen-

tal work and found necessary for the completion of the gun.

"2. Due to the experimental nature of the construction of this new type of gun, the original estimate of labor and material could not be accurately estimated, and it was accordingly anticipated that additional expenses might be necessary.

"3. It will be noted that the contract provides that all expenditures are under the direction and subject to the approval of the Chief of the Bureau of Ordnance.

"W. N. Hughes,
"By Direction of the Paymaster General."

On May 8, 1919, the following was written by the United States Navy Supply Officer to the plaintiff:

"United States Navy Yard, Washington, D. C.

"No. K21–581.
"Supply Department,
"8 May, 1919.

"A. H. Emery, Glenbrook, Conn.—Dear Sir: Your contract No. 581 dated 12 December, 1918, is hereby amended to provide for an increase in the total cost to the amount of $5,969.64. This increase is due to the fact that labor and material in excess of that estimated in the beginning of the experimental work was found necessary for the completion of the gun, and that the Chief of the Bureau of Ordnance, Navy Department, directed the incurring of the additional expense for the benefit of and to the interest of the government.

"Respectfully,
"[Signed] Chas. Conrad, Captain,
"Pay Corps, U. S. N., Supply Officer."

It will be noted that this letter bears the signature of the officer who signed the original contract in behalf of the government.

[3] Respecting this letter, it is the contention of the government that it purports to be merely an amendment to the contract, and is invalid by reason of the provision of section 3744 of the Revised Statutes (Comp. St. § 6895), which section, so far as is here pertinent, provides:

"It shall be the duty of the Secretary of War, of the Secretary of the Navy, and of the Secretary of the Interior, to cause and require every contract made by them severally on behalf of the government, or by their officers under them appointed to make such contracts, to be reduced to writing, and signed by the contracting parties with their names at the end thereof. * * *"

[4] It is true that, on an executory contract

required to be in writing by section 3744, and which does not comply with its requirements, no recovery may be had against the government for its failure to perform. Johnston v. U. S., 41 Ct. Cl. 76; Clark v. U. S., 95 U. S. 539, 24 L. Ed. 518; South Boston Iron Co. v. U. S., 18 Ct. Cl. 165, affirmed 118 U. S. 37, 6 S. Ct. 928, 30 L. Ed. 69. Where, however, services are rendered or material furnished under an oral contract, and the services or articles are accepted by the government and inure to the benefit of the government, recovery may be had upon a quantum meruit. Grant v. U. S., 5 Ct. Cl. 72; Barlow v. U. S., 35 Ct. Cl. 514; Burchiel v. U. S., 4 Ct. Cl. 549; Cohen, Endel & Co. v. U. S., 60 Ct. Cl. 513.

The letter of May 8, 1919, it seems, is not sufficient compliance with the requirements of section 3744. Johnston v. U. S., supra. But this is unimportant, as it is the rule that the invalidity of a contract because of noncompliance with section 3744 is immaterial after the contract has been performed. St. Louis Hay & Grain Co. v. U. S., 191 U. S. 159, 163, 24 S. Ct. 47, 48 L. Ed. 130; U. S. v. Andrews, 207 U. S. 229, 243, 28 S. Ct. 100, 52 L. Ed. 185. The instant case, therefore, must be decided without reference to section 3744, as the contract was completely executed and the money paid to the plaintiff in 1919.

A further contention of the defendant is that, irrespective of section 3744, the amendment was invalid by reason of the fact that there was no consideration for it, and that no benefit accrued to the government by reason of it. In J. J. Preis & Co. v. U. S., 58 Ct. Cl. 81, it was held that, where a supplemental contract is entered into with the government, by the terms of which a contractor is to receive additional payment for something which he was required to do under an already existing contract, no recovery may be had by the contractor on the supplemental contract. In that case the contractor had agreed to manufacture certain clothing and to return unused cloth. Subsequently a supplemental contract was entered into, in which the government agreed to pay the contractor a bonus for cloth returned. The plaintiff brought a suit to recover the bonus. The claim was dismissed, the court saying:

"The contract in question imposed no additional obligation on the plaintiff, while it did bind the government to pay the plaintiff for something which the plaintiff was bound to do under the original contract. Officers of the government are not expected nor can they contract for premiums to be paid by the United States on contracts which in themselves

bind the parties to do what the premium is offered for. It may well be determined that such contracts are void, not only for want of consideration, but also as being against public policy. The test in such cases is whether or not there was any benefit to be derived by the United States from the execution of the supplemental or modified contract. In the case at bar no such benefit is provided for in the supplemental contract."

In the case at bar it is not entirely clear whether the government did receive any additional consideration; that is, whether the plaintiff performed services or furnished materials which were not required under the original contract. Certain of the exhibits seem to indicate that this was done, but it does not appear just what was the value of the additional services or materials. The contract, it may be noted, calls for the manufacture and delivery of an experimental gun. A letter dated March 9, 1923, from the Chief of the Bureau of Ordnance to the Comptroller General, explains the position of the Bureau, and is, in part, as follows:

"4. The Bureau of Ordnance desires to make plain the fact that the purchase of the 4-inch gun in question was not the purchase of a gun per se, but was in fact the purchase of a theory as applied to gun construction in general. The sum of $5,000 named in the contract was an estimate of cost covering manufacture and certain tests, and unfortunately the contract provided that amount as the limit of cost, which fact escaped notice at the time the contract was made.

"5. The delivery of the gun in the completed state was but a part of the problem to be solved. There remained the demonstration of the theory of design and construction upon which the manufacture of the gun in question was based. The successful demonstration of the theory brought forth new ideas of design and manufacture, which were radical departures from old methods, and which have since been successfully applied, with a resultant saving to the government of many thousands of dollars.

"6. The estimated cost of $5,000 would not have completed the cost of construction and the demonstration of the theory; therefore the additional sum of $969.64 was necessary. The payment of this additional amount completed the problem in hand, and this bureau is inclined to the opinion that such increase over the contract price did move to the government in substantial financial benefit.

"[Signed]  Chas. B. McVay, Jr.
"Chief of Bureau."

The record does not disclose what part the plaintiff took in making the tests and demonstrations referred to in this letter. If he did take such part, it would be an additional consideration, as such services on his part are not called for by the original contract. However, a decision based on this ground could not be made without an additional hearing on the facts; but in view of the result reached, which is based on other grounds, further hearing is unnecessary. It might, however, be successfully claimed that the last three lines of the letter above quoted, showed the consideration moving to the government.

An inspection of the correspondence between the parties and among various departments of the government discloses the real nature of the circumstances which led to the making of the original contract. It appears that the limit of $5,000 specified in the original contract was not intended to be final, but was merely an estimate. This appears, in part, in the letters of May 5, 1919, and March 9, 1923, quoted supra. Paragraph 4 of the March 19, 1923, letter asserts that the provision in the contract for a limit of costs was an oversight. This is further substantiated by a letter of April 25, 1919, from the Bureau of Ordnance to the Bureau of Supplies and Accounts, by a letter of September 5, 1918, from Rear Admiral Earl, U. S. N., Chief of the Bureau of Ordnance, to the plaintiff, and by a letter to the plaintiff, dated November 20, 1918, from R. R. Ingersoll, senior member Special Board of Navy Ordnance.

[5] The government contends that the written contract binds the parties, and that their intention as expressed in writing in the contract must control. With this conclusion I cannot agree. It is a familiar principle of equity that written instruments, which, by reason of mutual mistake, do not express the real intention of the parties, may be reformed to carry out such intention. Hunt v. Rousmanier's Administration, 8 Wheat. 174, 5 L. Ed. 589; Bradford et al. v. Union Bank of Tennessee, 13 How. 57, 66, 14 L. Ed. 49; Chicago & A. Ry. Co. v. Green (C. C.) 114 F. 676; Carrell v. McMurray (C. C.) 136 F. 661; Pomeroy on Equity (4th Ed.) §§ 845, 870.

[6] It is unnecessary to consider whether the contract of 1918 would have been reformed by this court, had suit been brought by the plaintiff for that purpose. The contract was so reformed by the parties themselves, and there is every indication that those acting in behalf of the government did so in entire good faith and with due regard for the interests

of the United States. So far as it has been made apparent to the court, there being no indication to the contrary, there was full authority to make such change. This situation is different from that which existed in the Preis Case, supra, inasmuch as in that case there was no indication that the original contract did not conform to the intention of the parties. Fairness and due consideration for the interests of the government characterized the conduct of the agents of the United States, and there is no suggestion that any collusion, corruption, or bad faith played any part in the transaction. There is, therefore, no basis for holding that the amendment to the contract was unauthorized or illegal, and that payments made to the plaintiff under the amended contract were improper.

The counterclaim must therefore be dismissed, and judgment entered for the plaintiff for the sum of $969.64, together with his costs; and it is so ordered.